# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00352-CV

**Eric A. Anderson and Bettie J. Carrington, Appellants**

**v.**

**Phillip Shaw and Deborah Gail Moore, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. D-1-GN-07-000004, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal involves a dispute between neighboring landowners who claim ownership of the same two small triangular-shaped parcels of land, referred to in the trial court judgment as "the disputed triangles." Appellants Eric A. Anderson and wife Bettie J. Carrington claimed to have acquired the land by adverse possession or else are entitled to the land based on their prior possession. They filed suit, alleging trespass and damages. Appellees Phillip Shaw and wife Deborah Gail Moore, who had purchased the land, countered with pleadings seeking to resolve a boundary dispute and asserting a trespass to try title action. Abstracts of title were filed by all the parties.

Following presentation of appellants' case to a jury, the trial court granted appellees' request for an instructed verdict, ruling as a matter of law that appellees held record title to the disputed property, thereby defeating appellants' claim of prior possession. The issue relating to

adverse possession was submitted to the jury, which failed to find in appellants' favor. The trial court granted judgment in favor of appellees, awarding them attorney's fees as found by the jury. The trial court denied appellants' motion for judgment notwithstanding the verdict and other post-trial motions. Appellants bring this appeal. We will affirm.

## BACKGROUND

The parties trace their ownership to a common source, Thompson Patterson,[1] who owned a tract of land at his death. Patterson's real property estate was the subject of an 1891 partition lawsuit in Travis County. The trial court judgment partitioned his land into six lots. The judgment contains a plat of the property, showing how it was partitioned and alloted. Lot 1 is situated to the west of Lot 2. Lot 1 and Lot 2 share a common straight surveyed boundary line; both are bounded by Slaughter Creek on the north. The disputed triangles the subject of this litigation are situated on the Lot 2 side of the northern end of the dividing line between Lot 1 and Lot 2.

In 1929, Charles A. Freund acquired four of the Patterson lots, including all of Lot 2. The real property conveyed to Freund was described in the deed by reference to the 1891 partition and by a metes and bounds description calling for a straight boundary line between Freund's property and Lot 1 to his west. The deed to Freund conveys to him

> all that certain lot, tract or parcel of land lying and being situated in the County of Travis, State of Texas, being 142 acres out of the Santiago Del Valle Ten League Grant, Abstract No. 24, and being all of Lots Nos. 2, 3, 4 and 5, of the Partition of the lands belonging to the Estate of Thomson Patterson, deceased [followed by reference

---

[1] Patterson's first name is sometimes referred to as "Thomas" and "Thomson."

2

to the partition suit, district court minutes, and a metes and bounds description of the property].

Freund's deed is recorded at Vol. 445, page 445 of the Travis County deed records.

In 1937, Joe C. Carrington (sometimes referred to in the record as Joe Carrington, Sr.) acquired 117 acres west of Freund's tract, including the land that constituted Lot 1 of the Patterson estate. The metes and bounds description of the property deeded to Carrington called for a straight boundary line that ran with the west line of Freund's property. Thus, it was undisputed that both Freund's deed and Carrington's deed called for a straight surveyed boundary line between their properties, one line joined to the other, running north to Slaughter Creek.

At an unknown date, someone built a barbed wire fence between the Freund and Carrington properties. There is no evidence indicating who built it, when it was built, or why it was built. There was testimony that it had stood for at least fifty years and has never been moved. There was some evidence it was known as the "Carrington fence." It ran along the boundary line separating the Carrington property [Patterson Lot 1] from the Freund property [Patterson Lot 2].

The fence followed the original straight boundary line between the two properties, except for two areas along the line. At these two places, the fence deviated east of the line and cut into the Freund tract, causing two small triangular parcels of the Freund tract to lie west of the fence with the Carrington tract, instead of east of the fence with the rest of the Freund property. There was testimony that the fence deviated at places where the steep slope and densely vegetated and wooded topography made a straight fence difficult. These two triangular-shaped parcels, totaling less than one acre combined, are the disputed triangles the subject of this litigation.

3

Eventually, appellants acquired 6.846 acres out of the Carrington tract. The Freund property later became part of the Onion Creek Subdivision. Appellees bought a home in the subdivision near the disputed area.

In 1965, Freund, joined by his wife, conveyed his property to Rex Kitchens. At the time, Bryant-Curington, Inc. surveyed Freund's land. For an unknown reason, the survey followed the fence line, however, instead of Freund's straight western boundary line, thereby excluding the disputed triangles from the survey and the field notes.

Freund's deed describes the property Freund conveyed to Kitchens two ways: first, it describes all the property he acquired in his own deed, with reference to its recording, including all of Lot 2 of the Patterson partition, and, second, it describes the land by the field notes of the Bryant-Curington survey. The document states that the Freunds convey

> all that certain lot, tract or parcel of land…being a tract of 146.68 acres of land out of the Santiago Del Valle Ten League Grant, Abstract No. 24, and being all of Lots Nos. 2, 3, 4 and 5, of the Partition of the lands belonging to the Estate of Thompson Patterson, deceased; [followed by reference to the partition suit and the court minutes]; said tract being described as 142 acres in a deed from [grantor] to C. A. Freund, dated November 8, 1929, recorded in Vol. 445, Page 445, of the Travis County Deed Records. . . .

Appellants do not suggest that this description was in any way deficient. The deed goes on to state, however, that the land being conveyed is "more particularly described," followed by the field notes of the Bryant-Curington Survey, which omit the disputed triangles from the description. The Freund-to-Kitchens deed is recorded at Volume 3014, Page 118 of the Travis County deed records.

4

As appellants state, the conflict in the present case is caused by the trial court's construction of the 1965 deed from Freund to Kitchens. The trial court reconciled the conflict in the two property descriptions and ruled that Freund's expressed intent was to convey to Kitchens all the property that he owned, the entire 146.68 acres, including all of Lot 2, without reservation. Appellants dispute that construction, contending that Freund retained the two disputed triangles.

The land Freund conveyed to Kitchens was subsumed within larger tracts of land conveyed in several deeds thereafter, as set out in the instruments composing appellees' chain of title. None of these successive deeds refers to the Patterson partition or to the lots created thereby.

In 1969, the Kitchens family conveyed 748 acres to Demaret and Connolly, more particularly described as "all of that certain tract or parcel of land out of the Santiago Del Valle Ten League grant in Travis County, Texas, being those tracts of land as conveyed to Rex Kitchens, by deeds recorded in the deed records of Travis County, Texas, as follows: . . . a tract of land called 146.68 acres by Volume 3014, Page 118. . . ." The 748-acre tract is described by metes and bounds in the deed and calls for one line to run "along the East line of the said 117 acre Carrington tract and the West line of the said Kitchens tract 146.68 acres, the following courses," thereafter copying the same metes and bounds description from the Bryant-Curington survey stated in the deed from Freund to Kitchens.

Connolly and Demaret conveyed 897.23 acres to Lumbermen's Investment Corporation and C&D Investments in 1972, including the 748 acres conveyed to them by Kitchens. One of the calls runs "Thence along the East line of the 117.00 acre Carrington tract and the West

5

line of the said Kitchens tract 146.68 acres, the following courses," repeating the same calls as in the Bryant-Curington survey.

There followed several 960-acre conveyances that included the 146.68 Freund tract. C&D Investments conveyed its interest to Lumbermen's Investment Corporation[2] in 1984, using a slightly different metes and bounds description, calling for a line to run "thence along the fenced boundary of the J.C. Carrington tract" followed by 12 courses ending in Slaughter Creek. This was the first deed reference to the fence. Three successive 1985 deeds used the same description: Lumbermen's Investment Corporation to Onion Creek Development Company, St. James Realty Corporation to Onion Creek Development Company, and C&D Investments to Lumbermen's Investment Corporation, a Texas corporation. This Texas corporation was later merged into a Delaware corporation.

By 2006, much of the property had been developed into subdivisions. In 2006, Lumbermen's Investment Corporation, a Delaware corporation, conveyed 145.144 acres to LIC Investments, Inc. ("LIC"). The deed describes the land conveyed by reference to bordering subdivisions and by metes and bounds that follow appellants' fence line along the area of the disputed triangles. LIC conveyed a small tract, including the disputed triangles, to appellees in 2007.

In May 1968, Carrington's attorney had written surveyor Marlton O. Metcalfe that a boundary question arose concerning the exact location of the boundary line between Carrington and Kitchens and requested his help in resolving the matter. Claude Bush, a surveyor, prepared a survey for Carrington of his property in July 1968. Bush's survey followed the original straight

---

[2] Lumbermen's and its affiliates developed the Onion Creek and Parkside subdivisions.

6

boundary line between Carrington's property and Freund's property. Although the Bush survey depicted the fence outlining the disputed triangles, the survey did not include courses and distances for the fence, so that it is not possible to call out a description of the disputed triangles. Before Metcalfe did any survey work, Carrington wrote Metcalfe in October 1968 that he and Kitchens had settled the boundary question. The terms and resolution are unknown.

Bush revised his survey of the Carrington property in 1973. The modified Bush survey depicted subdivided parcels of land within the Carrington tract, one of which became appellants' 6.846-acre tract. The east boundary line of the 6.846-acre tract is part of Carrington's original straight boundary line. The revised Bush survey filled in the courses and distances needed to particularly describe the 6.846-acre tract but did not do the same for the disputed triangles. The 6.846-acre tract did not incorporate the disputed triangles, but the Bush survey shows that they are situated outside and along its eastern straight boundary.

In December 1973, Carrington conveyed one-half interest in the 6.846-acre tract to his son, Joe C. Carrington, Jr.; he conveyed the other one-half interest to him in February 1974. Both deed descriptions called for the east boundary to follow the original straight boundary line, not the fence line. When Joe C. Carrington, Jr. died in 1990, the estate deed to his widow, appellant Bettie J. Carrington, referred to the same property description, and when she remarried and later conveyed one-half interest in the property to her husband, the deed to appellant Eric Anderson also reflected the same straight boundary line. Thus, all the deeds in the chain of title from Joe C. Carrington, Sr. to appellants have described their property with a straight boundary line on the east, excluding the disputed triangles.

7

From Freund's deed until the 2007 deed from LIC to appellees, none of the area within the disputed triangles is contained within the specific metes and bounds descriptions in any of the deeds in either appellants' chain of title or appellees' chain of title. So far as the specific deed descriptions are concerned, the disputed triangles from Lot 2 are remnants or orphan tracts. Appellants' surveyor witness referred to them as "the remainder portions of the Estate of C. A. Freund."

Except for the suggestion in 1968 that there was some question about the boundary line, which was resolved, the adjoining owners apparently continued peaceably until the spring of 2003, when appellants first became aware that their eastern boundary line differed from the fence line. They discovered through Lumbermen's zoning request that there were claims that the disputed triangles were part of someone else's tract. Appellants began to document their hostile possession claim to these two tracts. They also realized that they had never paid taxes on the disputed triangles, but their attempt to do so was rejected. The taxes had been paid by Lumbermen's and its affiliates since at least 1983.

Meanwhile, appellees purchased their home on the northwest edge of the Onion Creek subdivision in 2005. Their property backed up to 6.6 acres of undeveloped greenbelt area between the north boundary of the Onion Creek neighborhood and Slaughter Creek. This undeveloped area included the disputed triangles. Appellees began investigating the area and discussing with Lumbermen's the possibility of purchasing the area to preserve it from development. This process apparently uncovered the issue concerning the deed descriptions and the matter of ownership of the disputed triangles. Until then, Lumbermen's and its affiliates did not know who owned the property

8

and had never claimed the disputed property. Lumbermen's gave appellees permission to explore the property and to remove the old fence and fence remains.

In 2007, appellees purchased the disputed property. LIC conveyed to appellees four tracts of land, totaling approximately 6.6 acres, including the two disputed triangles, with restriction that the land "be used only for open space, conservation area, natural habitat, and park purposes consistent with preservation of the natural habitat of the creek-side area in which it is located." The deed is without warranty as to the disputed triangles.

## DISCUSSION

The parties stipulated that they derived title through a common source, the 1891 partition of the Patterson estate. One manner of establishing title to land is by proving one holds a superior title out of a common source. *Land v. Turner*, 377 S.W.2d 181, 183 (Tex. 1964). Appellees successfully sought to prove that they held superior title by virtue of their chain of title from the Patterson estate to their deed. Two additional ways of establishing title to land are by proving one acquired title by limitations or by proving one has prior unabandoned possession. *Id.* Appellants unsuccessfully sought to prove that they acquired rights to the disputed triangles by one of these means.

Appellees' pleadings asserted a trespass to try title action, which is the proper method for determining title to land. *See* Tex. Prop. Code Ann. § 22.001 (West 2000); *Martin v. Amerman*, 133 S.W.3d 262, 267 (Tex. 2004). Appellants pleaded not guilty, thereby requiring appellees to

9

prove their title and right to possession. A proponent must recover on the strength of his own title. *Land*, 377 S.W.2d at 183. Appellants assert that appellees failed in their proof, and thus should take nothing.

In several points of error, appellants complain that the trial court erred by directing a verdict that appellees held record title to the disputed property and in refusing to render judgment for appellants, contending that appellees failed to prove they held title to the disputed land while appellants established their claims of title by limitations and prior possession as a matter of law. Their argument turns on their contention that the more particular metes and bounds description derived from the Bryant-Curington survey contained in Freund's deed to Kitchens must control over the more general description it contained.

Appellants take the position that Freund conveyed less than he owned to Kitchens, thus reserving the two disputed triangles. Because Kitchens never obtained title to the properties, they argue, none of the succeeding conveyances in appellees' chain of title conveyed title to the disputed triangles, so that LIC could not convey legal title to appellees. Appellants lodge a factual-sufficiency challenge to the jury's failure to find that they established facts entitling them to adverse possession, and they further complain that the trial court erred by not submitting the issue of prior possession to the jury. They also assert a conditional challenge to the costs and attorney's fees awarded to appellees and request judgment for themselves should they prevail on appeal.

Appellees disagree, arguing that Freund's intent to convey all his property was clear from the deed, that it was unreasonable to imagine that Freund would reserve these two disputed remnants (especially without expressly stating the same), that the law seeks to avoid such a result,

10

and that the trial court properly reconciled the discrepancy in the deed. Appellees contend that the trial court correctly construed the 1965 deed in their chain of title and thus correctly granted them an instructed verdict that they held record title, which necessarily precludes a claim of prior possession, rendering jury submission unnecessary. They rely on their deed and abstract of title to prove their ownership. They further contend that appellants failed to conclusively establish facts in support of their adverse-possession claim, and that the jury's failure to find in their favor was not contrary to the evidence. The trial court ruled in their favor.

### Construction of 1965 Deed from Freund to Kitchens

In their first two points of error, appellants complain that the trial court erred in instructing a verdict that appellees had record title to the disputed triangles, and in improperly denying appellees' motion for judgment notwithstanding the verdict. They contend that the trial court's error is based on its improper construction of the deed from Freund to Kitchens. A court may instruct a verdict if the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent, or if no evidence of probative force raises a fact issue on the material question presented in the suit. *Prudential Ins. Co. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

Appellants do not point out a disputed fact that would bar an instructed verdict on this matter. In fact, they sought a ruling as a matter of law in their own behalf. Instead, they disagree with the court's construction of the Freund-to-Kitchens deed that led to the court's verdict.

Appellants do not claim that the deed from Freund to Kitchens is ambiguous. The construction of an unambiguous deed is a question of law for the court. *Luckel v. White*,

11

819 S.W.2d 459, 461 (Tex. 1991). The courts have created a large number of rules to be applied as aids when construing written instruments of conveyance. Appellants and appellees each cite to authorities that support their positions.

The court's primary goal when construing a deed is to ascertain the true intention of the parties as expressed within the four corners of the instrument, and to harmonize all of its parts. *Id.*; *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986). If the language may be interpreted in different ways, rules of construction may be applied. *Prairie Producing Co. v. Schlacter*, 786 S.W.2d 409, 413 (Tex. App.—Texarkana 1990, writ denied). Because of the two legal descriptions in the deed, the trial court undertook to construe Freund's intent and the effect of his deed.

Appellants rely on a line of cases holding that a more particular description in a conveyance will control over a more general one.

> Where a grantor conveys specifically by metes and bounds, so there can be no controversy about what land is included and really conveyed, a general description, as of all of a certain tract conveyed to him by another person, or, as in this case, all of a survey except a tract belonging to another person, cannot control; for there is a specific and particular description, about which there can be no mistake, and no necessity for invoking the aid of the general description.

*Cullers v. Platt*, 16 S.W. 1003, 1005 (Tex. 1891). Appellants' surveyor testified that there was no doubt about the Bryant-Curington field notes, and that they could be followed on the ground. Where a grantor specifically conveys by metes and bounds, there can be no controversy over what land is conveyed. *Southern Pine Lumber Co. v. Hart*, 340 S.W.2d 775, 780 (Tex. 1960). If a general and a particular description are obviously intended to refer to the same land, and the two cannot be

12

reconciled, the particular description is preferred to the more general and will ordinarily control. *Sun Oil Co. v. Burns*, 84 S.W.2d 442, 447 (Tex. 1935); *Gibson v. Walton*, 315 S.W.2d 48, 57 (Tex. Civ. App.—Texarkana 1958, writ ref'd n.r.e.).

On the other hand, a general description may be looked to in aid of a particular one that is ambiguous, defective, or doubtful. *Ross v. Houston Oil Fields Ass'n*, 88 S.W.2d 586, 593 (Tex. Civ. App.—Galveston 1935, writ dism'd). A general description is not to be disregarded where it can be harmonized with the particular one. *Id.* The law presumes that a grantor conveys all that he has to convey and does not retain a narrow strip or parcel. *Terrill v. Tuckness*, 985 S.W.2d 97, 105-06 (Tex. Civ. App.—San Antonio 1998, no pet.). Where there is a conflict between a specific description by metes and bounds and a lot and block number, the latter will usually prevail. *Ross*, 88 S.W.2d at 592. When no other rule applies, a conveyance will be construed against the grantor, so as to convey the largest estate possible. *Lott v. Lott*, 370 S.W.2d 463, 465 (Tex. 1963).

Appellees contend that the *Cullers v. Platt* rule does not apply to the Kitchens deed. *Platt* is but one rule of construction, and is not to be used when the grantor's true intention clearly appears from the language of the entire instrument. *Sun Oil*, 84 S.W.2d at 446. Appellees also refer to the "strip and gore" doctrine as additional support for their position.

The "strip and gore" doctrine allows for a presumption that a deed conveys a small parcel of land omitted from the description of the land conveyed if the parcel (1) is small in comparison to the land conveyed; (2) is adjacent to or surrounded by the land conveyed; (3) belonged to the grantor at the time of the conveyance; and (4) was of no benefit or importance to the grantor.

13

*Alkas v. United Sav. Ass'n of Tex., Inc.*, 672 S.W.2d 852, 857 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.); *see Strayhorn v. Jones*, 300 S.W.2d 623, 638-39 (Tex. 1957). This presumption applies only when the deed is unclear whether it conveys the strip at issue. *Woolaver v. Texaco, Inc.*, 594 S.W.2d 224, 225 (Tex. Civ. App.—Fort Worth 1980, no writ); *Miller v. Crum*, 314 S.W.2d 389, 395 (Tex. Civ. App.—Fort Worth 1958, no writ). The presumption does not apply, of course, when the grantor plainly and specifically reserves the parcel. *Angelo v. Biscamp*, 441 S.W.2d 524, 526 (Tex. 1969); *Sigmar v. Anderson*, 212 S.W.3d 789, 795 (Tex. App.—Austin 2006, no pet.).

The record contains no evidence as to why Bryant-Curington did not include the disputed triangles in its survey and write field notes for Freund's entire tract, why the two parcels were omitted, or whether the omission was intentional or accidental. There is no evidence that Freund intended to retain them, and no record that Freund ever conveyed the two disputed triangles to anyone else.

Freund expressed his intent within the deed to convey to Kitchens all the land that he had acquired by his own deed, including all of Lot 2. The trial court harmonized the conflicting general and specific descriptions in the Freund-to-Kitchens deed in favor of Freund's conveyance of all his property. Freund expressly states in the deed that he conveys to Kitchens all of the property he acquired out of the Patterson partition, including all of Lot 2. He describes all the property he had received in his own deed and states a specific reference to the deed records by which he obtained his property, without reserving any part of the same. We hold that the trial court properly construed the deed as it did.

14

Appellants further contend that even if Freund conveyed all his property to Kitchens, as the trial court determined, the deeds thereafter do not convey the disputed triangles, so that even if they are wrong about the Freund-to-Kitchens deed, appellees could not receive record title to the property from LIC. We disagree. The succeeding deeds of the large properties into which Kitchens' property was subsumed are presumed to include all the land. If the Freund-to-Kitchens deed includes the disputed triangles, then they are also included in all the subsequent conveyances, including the one to LIC. In the construction of written instruments, all instruments in a chain of title, when referred to in a deed or instrument of conveyance, will be read into it. *Dixon v. Amoco Prod. Co.*, 150 S.W.3d 191, 194 (Tex. App.—Tyler 2004, no pet.). The record contains a recorded deed conveying the disputed triangles to appellees. We hold that appellees have shown they held title to the disputed triangles.

We overrule appellants' points one and two.

***Adverse Possession***

In their third and fourth points of error, appellants further complain that the trial court erred by failing to award them title to the disputed property. They contend that while Freund continued to retain record ownership of the two parcels, they or their predecessors obtained title to the disputed triangles by adverse possession. They complain that the evidence established their limitations title as a matter of law, and that the jury's failure to find in their behalf on this issue was against the great weight and preponderance of the evidence. They rely primarily on the existence of the fence and their unchallenged use of the property over the years.

15

To prevail on their third point, appellants must show that the evidence in the record conclusively established all vital facts in support of their adverse-possession claim. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). For appellants to prevail on their factual-sufficiency challenge to the jury's adverse answer, we must examine the entire record. In a factual-sufficiency review, we consider and weigh all the evidence and set aside a finding only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The question of adverse possession is a fact question. *Bywaters v. Gannon*, 686 S.W.2d 593, 595 (Tex. 1985). Appellants had the burden to plead and prove each element of their claim. It is for the jury to weigh the evidence and to resolve any inconsistencies or conflicts in making its decision. On review, we do not look to any one particular use or fact to decide whether the evidence supports the jury's verdict. Although one factor standing alone might not be enough to support the jury's finding, on appeal we must consider all the evidence in the light most favorable to the jury's finding. *See Wilson v. Whetstone*, No. 03-08-00738-CV, 2010 WL 1633087, at *11 (Tex. App.—Austin Apr. 20, 2010, no pet. h.).

Appellants claim to have acquired title to the disputed triangles by adverse possession under the ten-year statute of limitations, which does not require that they assert a claim under title, color of title, a registered deed, or a recorded instrument. *See* Tex. Civ. Prac. & Rem. Code Ann.

16

§ 16.026 (West 2002)[3] (ten-year bare possession statute). Appellants had the burden to prove that the claim was adverse and hostile for a continuous ten-year period, and to show a visible appropriation of the property. Adverse possession is defined as "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." *Id.* § 16.021(1). Possession must be "actual, visible, continuous, notorious, distinct, hostile, and of such character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant." *Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990); *see also Terrill v. Tuckness*, 985 S.W.2d 97, 107 (Tex. App.—San Antonio 1998, no pet.). The adverse possession must be hostile to the rights of the record owner. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1). The record must contain evidence that raised a fact issue as to whether appellants' use of the disputed property was in the nature of activities that constituted adverse possession—that is, that it was an actual and visible appropriation of the property such that the true owner was given notice of a hostile claim. *Rhodes*, 802 S.W.2d at 645; *Harlow v. Giles*, 132 S.W.3d 641, 646 (Tex. App.—Eastland 2004, pet. denied). Where the facts are conclusive, limitations may be held as a matter of law. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 757 (Tex. 2003).

We note first that if there was a hostile claim in 1968, it was settled. Thereafter, Joe C. Carrington, Sr. continued to respect the original straight boundary line through his conveyances, as did appellants. The only evidence of any hostility began in 2003, less than ten years

[3] "A person must bring suit not later than 10 years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who cultivates, uses, or enjoys the property." Tex. Civ. Prac. & Rem. Code Ann. § 16.026(a) (West 2002).

17

before trial, and accelerated once appellees began their purchase process. We note also that there is no evidence that appellants or their predecessors ever paid taxes on the disputed property.

There is no dispute that a fence was constructed between the Carrington and Freund properties at some point, that it continued to stand for decades, and that at two places it deviated from the boundary line. The reason for the fence was unknown. Appellants did not construct the fence. Who constructed it, its purpose, and whether it was permissive was unknown. Neighbors testified that the fence had always stood. Several Carrington family members testified that the fence had never been moved, that it was the only boundary delineation, that they maintained the fence over the years, and that they used and claimed everything within the fence. Appellants maintained the fence until the "purple paint law"[4] came into effect, after which they quit repairing the fence in the flood area near the creek and pond.

There is no evidence of hostility between the Carrington family and the Freund family, nor is there evidence that the Carringtons asserted a claimed right apparent to the Freunds. Joe Carrington, Sr. began operating a farm and dairy on his property in 1938. His cows grazed on his land, but there is no evidence the cows grazed on the disputed triangles. Carrington sold the milk processing and distributing operation in 1951, but he was still selling off some registered Holstein cows in 1958. There was no evidence of any grazing thereafter, although there may have been some chickens or small farm animals on the Carrington property. The dairy was located on the west side of Carrington's tract, not on the east side near the disputed triangles. Although the farm had been

___

[4] Texas Penal Code section 30.05 makes the use of purple paint a legally recognized boundary marker. *See* Tex. Penal Code Ann. § 30.05(b)(2) (West Supp. 2009).

cultivated for agricultural crops during Carrington, Sr.'s lifetime, there was evidence that the disputed triangles were not cultivated. They are situated on the eastern edge of the property in a location which was in a natural, wooded state, not conducive to grazing or cultivation. Appellant Bettie Carrington testified that she has been familiar with the property since the 1960s and had lived on it since 1974. She had never seen cows on the property since she became familiar with it. The disputed property comes within a few feet of the house in which appellants live, and in earlier years appellants planted bushes and flowers, gardened, and made other incidental and recreational use of the area on or near the disputed triangles.

The mere grazing of land incidentally enclosed by a fence created by another cannot support a claim of adverse possession. *McDonnold v. Weinacht*, 465 S.W.2d 136, 142 (Tex. 1971); *West Prod. Co. v. Kahanek*, 121 S.W.2d 328, 331 (Tex. 1938); *Mohnke v. Greenwood*, 915 S.W.2d 585, 593 (Tex. App.—Houston [14th Dist.] 1996, no writ); *Georgetown Builders, Inc. v. Heirs of Tanksley*, 498 S.W.2d 222, 224 (Tex. Civ. App.—Austin 1973, writ ref'd n.r.e.). A claimant relying on grazing by livestock to show adverse use must show that he "designedly enclosed" the tract at issue. *See Rhodes*, 802 S.W.2d at 645. The mere presence or maintenance of a fence that existed at the time the claimant began using the land is insufficient to show a designed enclosure. *See Terrill*, 985 S.W.2d at 108 (fence that existed before claimant took possession of land was casual fence and could not be designed enclosure). Rather, the claimant must at least raise a fact issue that he built the fence for the purpose of enclosing the tract at issue. Here, the fence existed when appellants came into ownership of the land; they did not "designedly enclose" the disputed property. Moreover, evidence that they maintained the fence is not enough. Repairing or

19

maintaining a casual fence, even for the express purpose of keeping the claimant's animals within the enclosed area, does not convert a casual fence into a designed enclosure. *Rhodes*, 802 S.W.2d at 645. In the present case, the evidence shows the fence to be a "casual fence." *See McDonnold*, 465 S.W.2d at 142; *Harlow*, 132 S.W.3d at 647.

Use by previous owners to graze livestock on the disputed triangles under these circumstances does not conclusively establish the fact of appellants' adverse possession. *See Georgetown Builders, Inc.*, 498 S.W.2d at 224 (mere grazing of land incidentally enclosed as result of construction of fences built for another purpose does not constitute possession that will ripen into title by limitation). There is no evidence as to who built the fence, but there is some evidence that its placement was dictated by the terrain. Cutting weeds, gardening, and clearing trees are insufficient acts to establish a designed enclosure. *Mohnke*, 915 S.W.2d at 594. The conveyances in the Carrington chain of title, recognizing the original boundary line, also reflect some evidence that the possession of appellants and their predecessors was not adverse. *See Peters v. Gillund*, 186 S.W.2d 1019, 1020 (Tex. Civ. App.—Galveston 1945, writ ref'd n.r.e.).

The claimant's possession of the property at issue must be hostile to the record owner. *Porter v. Wilson*, 389 S.W.2d 650, 658 (Tex. 1965). The test for hostility is whether the acts performed by the claimant of the land and the use made of the land were of such a nature and character as to reasonably notify the true owner of the land that a hostile claim to the property was being asserted. *Winchester v. Poretto*, 432 S.W.2d 170, 174-75 (Tex. Civ. App.—Houston [1st Dist.] 1968, writ ref'd n.r.e.). There is no evidence of hostile actions toward Freund, whom appellants assert to be the true record owner, or toward any successor until at least 2003.

20

Although the record contains factual evidence relating to appellants' adverse possession claim to the disputed triangles, we cannot say from the record that the appellants established their limitations title as a matter of law. Likewise, we cannot say that the jury's failure to find in their favor is against the great weight and preponderance of the evidence so as to be manifestly unjust.

We overrule points of error three and four.

*Prior Possession*

In their fifth and sixth points of error, appellants complain that the trial court erred by failing to render judgment in their behalf on the basis that they established their title by prior possession as a matter of law, or else by refusing to submit the issue to the jury. They concede that if title is correctly established in appellees, that title would defeat their prior-possession claim.

The presumption of title arises from possession, and the doctrine of prior possession is based on the theory that one in possession should not be disturbed except by one having a better title. *Reiter v. Coastal States Gas Producing Co.*, 382 S.W.2d 243, 250-51 (Tex. 1964). Prior possession stands as an evidentiary rule providing that one in possession of the property is the presumptive owner unless the challenger proves a superior right. Prior possession indicates ownership against one who has failed to establish paper title. *Walsh v. Austin*, 590 S.W.2d 612, 614 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ dism'd w.o.j.). One who fails to establish title by limitations may still obtain judgment by reason of prior possession. *Id.*

Appellants' complaints again turn on their contention that appellees failed to prove that they held record title. Because we have overruled appellants' complaints about the trial court's ruling on title, we also overrule points five and six.

### *Conditional Complaint*

Appellants lodge a seventh point of error, conditioned on their successful appeal, which they assert without discussion or citation, asking that the attorney's fees and costs awarded to appellees be reversed and that costs and fees be awarded to them instead. Because we have overruled appellants' other points of error, we overrule point seven as well.

### CONCLUSION

Having overruled all of appellants' points of error, we affirm the trial court judgment.

_____

Marilyn Aboussie, Justice

Before Chief Justice Jones, Justices Henson and Aboussie*

Affirmed

Filed: June 18, 2010

* Before Marilyn Aboussie, Chief Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 2005).